**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

MICHAEL HAINES,

               Plaintiff,

      v.

TAKEDA PHARMACEUTICALS USA, INC.,
*et al.*,

              Defendants.

Civil Action No. 20-04336 (GC) (JBD)

**OPINION**

**CASTNER, District Judge**

      This matter comes before the Court upon Defendants Takeda Pharmaceuticals USA, Inc.

("Takeda") and Serina Fischer's motion for summary judgment, pursuant to Federal Rule of Civil

Procedure ("Rule") 56.  (ECF No. 27.)  Plaintiff Michael Haines opposed (ECF No. 31), and

Defendants replied (ECF No. 33).  The Court has carefully considered the parties' submissions

and decides the motion without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b).

For the reasons set forth below, and other good cause shown, Defendants' motion is **GRANTED**

**IN PART** and **DENIED IN PART**.

## I.  BACKGROUND[1]

### A.  FACTUAL BACKGROUND[2]

The Court recites only the uncontested facts necessary to contextualize the present motion.[3]
In July 2018, Plaintiff began his employment with Takeda as a Regional Business Director.
(DSUMF & PRDSUMF ¶ 5.)  Plaintiff was the only Black Regional Business Director serving
under his supervisor in the Great Lakes territory.  (PSUMF & DRPSUMF ¶ 2.)  As his position
was a field-based sales position, Plaintiff lived and operated out of New Jersey while serving the
Great Lakes territory.  (DSUMF & PRDSUMF ¶ 6.)  Plaintiff's offer letter for this initial position
with Takeda (the "First Offer Letter") included a one-time signing bonus of $65,000 (the "Signing
Bonus").  (DSUMF & PRDSUMF ¶ 9; Defs.' Ex. 16, First Offer Letter, ECF No. 27-5 at 10.)  By
the terms of the First Offer Letter, the Signing Bonus had to be repaid to Takeda if Plaintiff's
employment ended within two years of his start date for a reason other than a company
restructuring or reduction in workforce.  (ECF No. 27-5 at 10.)

In 2019, Plaintiff saw Fischer at a social function in Los Angeles.  (DSUMF & PRDSUMF
¶ 15.)  Fischer, a Vice President of Marketing at Takeda, was one of the people who interviewed
Plaintiff for his initial hiring at Takeda.  (DSUMF & PRDSUMF ¶ 8; PSUMF & DRPSUMF ¶

---

[1]    On a motion for summary judgment, the Court "draw[s] all reasonable inferences from the
underlying facts in the light most favorable to the nonmoving party."  *Jaffal v. Dir. Newark New
Jersey Field Off. Immigr. & Customs Enf't*, 23 F.4th 275, 281 (3d Cir. 2022) (quoting *Bryan v.
United States*, 913 F.3d 356, 361 n.10 (3d Cir. 2019)).

[2]    Defendants' Rule 56.1 Statement of Undisputed Material Facts ("DSUMF") is at ECF No.
27-2; Plaintiff's Response to Defendants' Statement of Undisputed Material Facts ("PRDSUMF")
is at ECF No. 31 at 19-31; Plaintiff's Statement of Undisputed Material Facts ("PSUMF") is at
ECF No. 31 at 1-19; and Defendants' Response to Plaintiff's Statement of Undisputed Material
Facts ("DRPSUMF") is at ECF No. 33-1.

[3]    All other relevant or material facts are contested and will be recited where applicable in the
Court's analysis below.

10.)  Plaintiff expressed to Fischer a desire to obtain marketing experience and inquired as to whether she had any openings on her team.  (DSUMF & PRDSUMF ¶ 16.)  Sometime thereafter, although Plaintiff had no marketing experience in the industry, he was offered an interview for a marketing role on Fischer's team.  (DSUMF & PRDSUMF ¶ 17.)  In May 2019, Takeda offered Plaintiff the position of Associate Director within the Behavioral Disorders, Health Care Professionals ("HCP") Marketing Division.  (DSUMF & PRDSUMF ¶ 18.)  In his new role, Plaintiff reported to Erik Cline.  (DSUMF & PRDSUMF ¶ 19.)  Cline, in turn, reported to Fischer. (*Id.*)

Plaintiff's new role was conditioned upon his relocation to the Boston area.  (DSUMF & PRDSUMF ¶¶ 20-21; PSUMF & DRPSUMF ¶ 5.)  The relocation requirement was memorialized in a May 22, 2019 Offer of Employment Letter (the "Second Offer Letter"), signed by Plaintiff. (Defs.' Ex. 8, Second Offer Letter, ECF No. 27-4 at 63-66.)  The Second Offer Letter promised Plaintiff two types of benefits to support his relocation to the Boston area: (1) relocation support; and (2) a one-time bonus payment of $50,000 "to further assist [Plaintiff] in [his] transition to the Boston area" (the "Transfer Bonus").  (DSUMF & PRDSUMF ¶¶ 23-24; ECF No. 27-4 at 65.)  By the terms of the Second Offer Letter, the Transfer Bonus was only to be paid "within 30 days of a signed contract for the purchase or lease of a home in the Boston area."  (ECF No. 27-4 at 65.)  On May 24, 2019, Plaintiff was informed by a relocation vendor that Plaintiff's relocation support would not be processed until after his move to Boston was complete.  (DSUMF & PRDSUMF ¶ 27.)

On August 28, 2019, Plaintiff emailed Human Resources Business Partner Jane Runde and inquired further about when the Transfer Bonus would be paid.  (DSUMF & PRDSUMF ¶ 31.) The email chain read as follows:

> Hello [Runde] – [I] hope all is well.  We spoke a few months ago when [I] was transitioning into my position in marketing.  I was hoping you could answer a question for me.  According to my relocation to Boston [I] was offered the $50k [Transfer Bonus].  Can you let me know the timing for that payment.  I've been working in Lexington[, Massachusetts] for 3 months now.
>
> [(*Id.*)]

Runde replied:

> Once you physically move and give me your new address you will receive your transfer bonus.  Hope that helps.
>
> [(*Id.*)]

Plaintiff then asked:

> Are there ever exceptions where it . . . can be given pre[-]move?  For example[, I] [m]ay continue to commute or [I] may just get an apartment and not move the whole family – just myself.  How would that work?"
>
> [(*Id.*)]

Runde replied:

> No exceptions – once you get your apartment you just need to let me know.
>
> [(*Id.*)]

Thereafter, Plaintiff began looking for an apartment.  (*See* DSUMF & PRDSUMF ¶ 35.)  Plaintiff expressed to a landlord in Boston, Eric Lindsey, that Plaintiff needed a "crash pad or temporary lease that was flexible . . . ."  (DSUMF & PRDSUMF ¶ 35.)  Following their conversation, Lindsey sent Plaintiff an email via DocuSign that read "Please DocuSign Tenancy at Will."  (DSUMF & PRDSUMF ¶ 36.)  When Plaintiff accessed the enclosed document, he saw that Lindsey had not signed it.  (DSUMF & PRDSUMF ¶ 37.)  Plaintiff signed the document, and then received a second email from Lindsey stating that all parties had completed the rental lease.

(DSUMF & PRDSUMF ¶ 38.)

The lease itself was for an apartment near Boston, with a start date of October 15, 2019, which Plaintiff agreed to pay $2,200 a month to lease.  (DSUMF & PRDSUMF ¶ 40.)  The lease, however, does not specify any unit to be leased in the building and Plaintiff testified that he never spoke with Lindsey about leasing any unit in particular.  (DSUMF & PRDSUMF ¶ 41.)  Plaintiff further testified that although he signed a tenancy-at-will, allowing him a right to lease an apartment from Lindsey, he never actually saw or leased the apartment.  (DSUMF & PRDSUMF ¶¶ 42-43.)  Plaintiff also testified that he never paid Lindsey any money to lease the apartment.  (DSUMF & PRDSUMF ¶ 44.)  Plaintiff stated that he did not want to lease the apartment from Lindsey at that time because he was exploring various financial arrangements like whether his wife's employer would pay for the apartment.  (DSUMF & PRDSUMF ¶ 45.)

After communicating with Lindsey and signing the above discussed tenancy-at-will lease, on October 6, 2019, Plaintiff emailed Runde stating that he had an apartment, and provided Runde with an address.  (DSUMF & PRDSUMF ¶ 32.)  Plaintiff did not provide her with a signed lease.  (DSUMF & PRDSUMF ¶ 33.)  Runde thanked him, congratulated him on the new apartment, and told Plaintiff that she would submit the Transfer Bonus for processing.  (*Id.*)

After Plaintiff received the Transfer Bonus, he continued to reside in New Jersey, commuting weekly from his home in New Jersey to Takeda's offices in the Boston area.  (DSUMF & PRDSUMF ¶ 47.)  Plaintiff's supervisors were not aware that Plaintiff claimed the Transfer Bonus, and so, Plaintiff's supervisors continued to approve expenses for Plaintiff to commute from New Jersey and stay in hotels while working in Boston every week.  (DSUMF & PRDSUMF ¶ 49.)  Through February 2020, Plaintiff continued to commute from New Jersey to Boston and accrued more than $13,000 in commuter costs, which he expensed to Takeda.  (DSUMF &

PRDSUMF ¶ 50.)

On February 19, 2020, Fischer and Runde met to discuss Fischer's team and how the transition to the Boston headquarters was going.  (DSUMF & PRDSUMF ¶ 51.)  Fischer expressed concern about whether Plaintiff was going to stay with Takeda because he still had not moved to Boston.  (DSUMF & PRDSUMF ¶ 52.)  Runde expressed her understanding that Plaintiff already obtained an apartment and moved to Boston and that Runde was unaware that Plaintiff continued to reside in New Jersey and was expensing his travel to Takeda.  (DSUMF & PRDSUMF ¶¶ 53-54.)  Fischer corrected Runde, telling her that Plaintiff could not have moved since Fischer had just approved his expenses for hotels during his travel to Boston.  (DSUMF & PRDSUMF ¶ 55.)  Fischer knew Plaintiff had not moved to Boston, but she was unaware he had claimed the Transfer Bonus.  (DSUMF & PRDSUMF ¶ 56.)

After Fischer and Runde's meeting, Runde forwarded Fischer her email exchange with Plaintiff where Plaintiff stated that he had an apartment.  (DSUMF & PRDSUMF ¶ 57.)  Fischer then asked whether Runde obtained documentation to prove that Plaintiff leased an apartment, and Fischer expressed to Runde her disappointment with the situation.  (DSUMF & PRDSUMF ¶ 58.)

On February 24, 2020, Runde emailed Plaintiff and asked him for a copy of his Boston lease.  (DSUMF & PRDSUMF ¶ 59.)  Plaintiff responded to Runde with a copy of the lease that bore only his signature, not Lindsey's.  (DSUMF & PRDSUMF ¶¶ 60.)  Runde then asked for a fully executed copy of the lease.  (DSUMF & PRDSUMF ¶ 61.)  Plaintiff responded by signing Lindsey's name on the lease, without Lindsey's knowledge or authorization, and returned it to Runde.  (DSUMF & PRDSUMF ¶ 63.)[4]

---

[4]     Although Plaintiff admits that he signed the lease on Lindsey's behalf and without his authorization, Plaintiff notes that "[s]ince . . . Runde only gave Plaintiff 48 hours to send her the lease, and Plaintiff only had a copy of the DocuSign version he signed . . . available to him at the

In light of the above confusion, Takeda launched an investigation into the circumstances of Plaintiff's Transfer Bonus receipt. (DSUMF & PRDSUMF ¶ 65.) When Plaintiff was interviewed, he admitted that he never moved to Boston, did not move into the apartment that he stated he leased, and he never paid rent. (DSUMF & PRDSUMF ¶ 66.) Plaintiff told investigators that the reason for this was because his wife's start-up company was in financial trouble, so he decided against getting the apartment in Boston right away. (DSUMF ¶ 67; PRDSUMF ¶¶ 67-68.)

Takeda's Company Standards of Conduct and Work Rules ("Takeda Policies") state that "[i]f an employee's performance, attendance, or conduct violates Takeda's standards and/or rules, disciplinary action may be taken, up to and including termination of employment." (DSUMF & PRDSUMF ¶ 77.) The Takeda Policies enumerate several examples of behaviors that might justify termination, even for a single offense:

> Actions which result in and/or give the appearance of being motivated by an employee's desire for inappropriate personal financial gain for themselves and/or others . . . Oral or written dishonesty or misrepresentation; . . . any other misrepresentation about a claim for any . . . other employee benefit[.]

> [(DSUMF & PRDSUMF ¶ 78.)]

Following Takeda's investigation, Laura Bokhof, a Human Resources Business Leader, briefed Fischer on the results of the investigation and recommended that Plaintiff's employment be terminated. (DSUMF & PRDSUMF ¶¶ 70-71.) Fischer expressed surprise and disappointment but agreed with the recommendation. (DSUMF & PRDSUMF ¶ 72.) Steve Schaeffer, Fischer's

---

time, Plaintiff signed . . . Lindsey's name onto the version he had." (PRDSUMF ¶ 63.) Plaintiff argues, however, that such fact does not negate the undisputed fact that the lease was fully executed by Lindsey. (*Id.* (citing PSUMF ¶¶ 31-32).)

supervisor, was also briefed, expressed disappointment, and agreed with the recommendation to terminate Plaintiff.  (DSUMF & PRDSUMF ¶¶ 73-74.)  As a result, Plaintiff was terminated effective March 9, 2020.  (DSUMF & PRDSUMF ¶ 75.)  Defendants' stated reason for terminating Plaintiff was dishonesty.  (*Id.*; Pl.'s Ex. II, Defs.' Termination Script, ECF No. 31-38.)

### B. PROCEDURAL BACKGROUND

A few days after his termination, Plaintiff filed this action against Defendants in the Superior Court of New Jersey.  (ECF No. 1-1.)  On April 15, 2020, Defendants removed the action to this Court.  (ECF No. 1.)  Plaintiff brings two counts against Defendants: (1) race-based discrimination under the New Jersey Law Against Discrimination (NJLAD) against Takeda ("Count I"), and (2) individual liability under the NJLAD against Fischer ("Count II").  (ECF No. 1-1 ¶¶ 59-70.)  Defendants, in turn, brought several counterclaims: (1) Breach of Contract as to the Signing Bonus ("Counterclaim I"), (2) Breach of Contract as to the Transfer Bonus ("Counterclaim II"), (3) Breach of the Implied Covenant of Good Faith and Fair Dealing ("Counterclaim III"), and (4) Unjust Enrichment ("Counterclaim IV").  (ECF No. 5 ¶¶ 37-69.) Following the close of discovery, Defendants filed this motion for summary judgment both against Plaintiff's claims and in favor of their counterclaims.  The Court now decides Defendants' motion in its entirety.

## II. <u>LEGAL STANDARD</u>

The Federal Rules of Civil Procedure provide that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000).  In deciding a motion for summary judgment, a court must construe all facts and inferences

in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine dispute of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine dispute as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine disputes of material fact exist). "[U]nsupported allegations in . . . pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine [dispute] of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

In deciding a motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter but to determine whether there is a genuine dispute for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). The summary

judgment standard, however, does not operate in a vacuum.  "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden."  *Anderson*, 477 U.S. at 254.

## III.   DISCUSSION

### A.   PLAINTIFF'S DISCRIMINATION CLAIMS

#### 1.   COUNT I: RACIAL DISCRIMINATION AGAINST TAKEDA

Defendants argue that there is no evidence in the record to support a finding of discriminatory discharge.  (*See* Defs.' Mot., ECF No. 27-1 at 25-26.)  Plaintiff counters that evidence of "implicit bias" at Takeda can defeat Defendants' motion, and that Takeda treated Plaintiff differently than other employees when deciding to terminate him.  (*See* Pl.'s Opp'n, ECF No. 31-1 at 16-17, 27.)  For the reasons below, Defendants' motion for summary judgment on Count I is granted.

The NJLAD makes it unlawful "[f]or an employer, because of the race . . . of any individual . . . to refuse to hire or employ or to bar or to discharge . . . from employment such individual" unless justified by lawful considerations other than race.  *See* N.J. Stat. Ann. § 10:5-12(a).[5]  New Jersey courts employ the *McDonnell-Douglas* burden-shifting framework in assessing employment discrimination claims under the NJLAD.  *Meade v. Twp. of Livingston*, 265 A.3d 148, 159 (N.J. 2021) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)).  Under the *McDonnell-Douglas* burden shifting analysis:

> (1) the plaintiff must come forward with sufficient evidence to constitute a prima facie case of discrimination; (2) the defendant must then show a legitimate nondiscriminatory reason for its decision; and (3) the plaintiff must then be given the opportunity to

---

[5]     The parties do not dispute the applicability of New Jersey law to all claims at issue in this matter.  (*See generally* ECF Nos. 27-1, 31-1.)

show that defendant's stated reason was merely a pretext or discriminatory in its application.

[*Id.* (quoting *Henry v. Dep't of Hum. Servs.*, 9 A.3d 882, 888 (N.J. 2010)).]

"[T]he first step in [the *McDonnell-Douglas*] analysis requires plaintiff to demonstrate that he or she can meet each of the elements of the prima facie case." *Kirschling v. Atl. City Bd. of Educ.*, 10 F. Supp. 3d 587, 594 (D.N.J. 2014), *aff'd*, 604 F. App'x 153 (3d Cir. 2015) (quoting *Victor v. State*, 4 A.3d 126, 141 (N.J. 2010)). "There is no single prima facie case that applies to all [NJLAD] discrimination claims." *Victor*, 4 A.3d at 141. "Instead, the elements of the prima facie case vary depending upon the particular cause of action." *Id.*

Plaintiff alleges that "Takeda's articulated reason for terminating Plaintiff's employment is a pretext for discrimination on the basis of Plaintiff's race that violates the" NJLAD. (ECF No. 1-1 ¶ 62.) In other words, Plaintiff alleges Takeda discriminatorily terminated him on account of his race. (*Id.* ¶¶ 62, 68.) Such allegations sound of a discriminatory discharge claim under the NJLAD. The *prima facie* standard of a discriminatory discharge claim under the NJLAD is "(1) that plaintiff is in a protected class; (2) that plaintiff was otherwise qualified and performing the essential functions of the job; (3) that plaintiff was terminated; and (4) that the employer thereafter sought similarly qualified individuals for that job." *Kirschling*, 10 F. Supp. 3d at 594 (quoting *Victor*, 4 A.3d at 141).

a.    Plaintiff's *Prima Facie* Showing

Both Plaintiff and Defendants appear to apply a different *prima facie* standard than the one set forth in *Victor*. (ECF No. 27-1 at 18; ECF No. 31-1 at 14.) Specifically, the parties apply a legal standard that requires a materially different fourth element than that identified in *Victor*. (*See* ECF No. 27-1 at 18 (listing the fourth element of a prima facie race discrimination claims as "(4)

the adverse action was taken under circumstances giving rise to an inference of discrimination"); ECF No. 31-1 at 14 (listing the same fourth element as Defendants and relying on *Williams v. Pemberton Twp. Pub. Schs.*, 733 A.2d 571, 578 (N.J. Super. Ct. App. Div. 1999), for the proposition that in the context of the NJLAD "the appropriate fourth element of a plaintiff's prima facie case [for discrimination under the NJLAD] requires a showing that the challenged employment decision (i.e., failure to hire, failure to promote, wrongful discharge) took place under circumstances that give rise to an inference of unlawful discrimination.").)   The Court, however, finds that the appropriate standard to apply to a discriminatory discharge claim under the NJLAD is that set forth by the New Jersey Supreme Court in *Victor.  See Victor*, 4 A.3d at 141.[6]

Against the standard set forth in *Victor*, Plaintiff has not established a *prima facie* case under the *McDonnell-Douglas* framework for Count I.   Plaintiff's Complaint includes no allegation that Takeda sought a similarly qualified individual to replace Plaintiff after his termination.  (*See generally* ECF No. 1-1.)   *Victor*, 4 A.3d at 141.  Such omission alone justifies granting Defendants' motion as to Count I.

---

[6]      Several courts have applied the same standard set forth in *Victor* when analyzing discriminatory discharge claims under the NJLAD.   *See, e.g., Zive v. Stanley Roberts, Inc.*, 867 A.2d 1133, 1145 (N.J. 2005) (noting that *prima facie* termination claim under NJLAD requires plaintiff to show "the employer sought someone to perform the same work after [the plaintiff] left"); *see Bassett v. Rent-A-Ctr.*, 80 F. App'x 776, 778-79 (3d Cir. 2003) (describing race-based discriminatory discharge claim under NJLAD as requiring plaintiff to prove "he was replaced" (citing *Clowes v. Terminix Int'l Inc.*, 538 A.2d 794, 805 (1988))); *see also Smith v. Millville Rescue Squad*, 139 A.3d 1, 14 (N.J. 2016) (finding all discriminatory discharge claims under NJLAD require showing "(4) that the employer thereafter sought similarly qualified individuals" for the job that the plaintiff as terminated from"); *Kravits v. Royal Oaks Apartments, LLC*, 2022 WL 244115, at *4 n.7 (N.J. Super. Ct. App. Div. Jan. 27, 2022) (noting that discriminatory discharge claim requires plaintiff to show that "defendant . . . sought similarly qualified individuals for that job" after plaintiff was terminated); *Johnson v. N.J. Dep't of Corrections*, 2011 WL 5105486, at *3 (N.J. Super. Ct. App. Div. Oct. 28, 2011) (describing a race-based discriminatory discharge claim under the NJLAD as requiring "(4) that the employer thereafter sought similarly qualified individuals for plaintiff's job").

> b.  Defendants' Legitimate Nondiscriminatory Reason for Terminating Plaintiff

Even under the standard set forth in *Williams*, however, Count I does not survive the rest of the *McDonnell-Douglas* framework.  At the first burden-shift of the framework, Defendants must provide a legitimate nondiscriminatory reason for terminating Plaintiff.  *Meade*, 265 A.3d at 159.  Defendants provide evidence that under the Takeda Policies, an employee can be terminated for a single occurrence of either "[o]ral or written dishonesty or misrepresentation" or "[a]ctions which result in and/or give the appearance of being motivated by an employee's desire for inappropriate personal financial gain for themselves and/or others."  (DSUMF & PRDSUMF ¶¶ 77-78; Def.'s Ex. 17, ECF No. 27-5 at 13-25.)  The undisputed facts establish that Defendants believed[7] Plaintiff was being dishonest with them about his move to Boston just so that he could collect the Transfer Bonus.  (DSUMF & PRDSUMF ¶¶ 51-75.)  Defendants provide documentation of Takeda's investigation into Plaintiff's conduct, which concluded that Plaintiff improperly misled Runde into believing he was physically moving into an apartment in Boston in the near future.  (*See* Defs.' Ex. 11, ECF No. 27-4 at 74-78.)  Defendants have thus satisfied their burden of showing a legitimate nondiscriminatory reason for terminating Plaintiff.

> c.  Plaintiff's Argument that Defendants' Stated Reason is Pretextual

At the final burden-shift in the *McDonnell-Douglas* framework, Plaintiff must "prove by a preponderance of the evidence that the reason articulated by the employer [for his termination]

---

[7]  For a discrimination claim, it does not matter whether an employer was mistaken about what an employee did to justify his termination.  *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) ("To discredit the employer's proffered reason . . . [a] plaintiff cannot simply show that the employer's decision was wrong or even mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."); *Kwiatkowski v. Merrill Lynch*, 2008 WL 3875417, at *8 (N.J. Super. Ct. App. Div. 2008) (applying the rule in *Fuentes* to NJLAD discrimination claim).

was merely a pretext for discrimination and not the true reason for the employment decision." *Meade*, 265 A.3d at 160.  A plaintiff cannot defeat summary judgment unless he can "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Zive*, 867 A.2d at 1144 (quoting *Fuentes*, 32 F.3d at 764).  To accomplish such task through circumstantial evidence, a plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendants'] proffered legitimate reasons for [their] action that a reasonable factfinder could rationally find them unworthy of credence, and . . . infer that [Defendants] did not act for the asserted non-discriminatory reasons." *Griffith v. PNC Bank*, Civ. No. 13-5407, 2015 WL 2400222, at *7 (D.N.J. May 20, 2015) (internal quotation marks and citation omitted).  Pretext, however, "cannot be established based on speculation and mere conclusory allegations." *Sutton v. Bd. of Educ. of Plainfield*, Civ. No. 13-5321, 2015 WL 9308251, at *8 (D.N.J. Dec. 22, 2015).

Plaintiff has not met his burden to establish pretext.  Plaintiff directs the Court to two groups of evidence that he suggests show that Takeda engaged in implicit bias and that Takeda's stated reason for terminating him was pretextual: (1) racial bias by Schaeffer and Fischer and (2) disparate treatment of Plaintiff as opposed to other similarly situated white employees.  (ECF No. 31-1 at 7, 19, 27-29, 31.)

First, to the extent that Plaintiff argues that implicit bias caused his termination,[8] the Court cannot credit such a speculative argument without supporting evidence.  *See Kunik v. New York*

---

[8]     (*See, e.g.*, ECF No. 31-1 at 16 (arguing "[i]t has long been known that predominately white organizations often produce implicit biases against women and minorities," appearing to suggest that such implicit bias must have led to Plaintiff's termination).)

*City Dep't of Educ.*, 842 F. App'x 668, 673 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 786 (2022) (affirming judgment where plaintiff "presented no evidence to support her speculative allegations that defendants harbored implicit bias towards her based on her age or religion").

Second, Plaintiff maintains that the evidence in the record establishes that Schaeffer maintained a racial bias that contributed to Plaintiff's termination.   Plaintiff alleges in his Undisputed Material Facts that:

> In January 2020 . . . Schaeffer, who is white, terminated a marketing campaign because the hero of the campaign was a [B]lack female teacher [(the "Abandoned Marketing Campaign")].     Plaintiff discussed this incident with [] Cline who told him about [] Schaef[f]er's 'strange' commentary, and Plaintiff wondered why he had focused on the marketing campaign using a '[B]lack' teacher, rather than just a teacher.    Schaef[f]er overrode Takeda's own market research showing that the [Abandoned Marketing Campaign] tested higher than other concepts. [] Schaef[f]er typically did not second-guess the marketing campaigns prepared by his vice presidents, but he made an exception for the campaign with the black teacher because he did not like it.    The [Abandoned Marketing Campaign] had cost over a $1 million but was scrapped and replaced with a campaign using a white woman business owner instead.
>
> [(PSUMF ¶¶ 21-27 (citation omitted).)]

Plaintiff cites to Plaintiff's deposition and Schaeffer's deposition to support these factual allegations.  (Pl.'s Dep. 108:3-110:6, ECF No. 31-8; Schaeffer's Dep. 13:18-22:20, 29:20, 66:13-22, ECF No. 31-15.)[9]

---

[9]     Plaintiff also cites an exhibit that contains a picture of two suggested marketing campaigns — one containing a Black, female teacher confidently looking at the camera in a classroom with children (the Abandoned Marketing Campaign); and the other depicting a white, female businesswoman in front of a store front (which Takeda opted to pursue instead of the Abandoned Marketing Campaign).  (*See* Pl.'s Ex. N, Marketing Concepts, ECF No. 31-17.)

But Plaintiff's purported evidence of Schaeffer's racial bias does not truly support his allegations.  For starters, Schaeffer testified that he advised against using a teacher in the marketing campaign because it "could imply that [the product] was being marketed in this particular execution to children and the intent was to market it to adults."  (Schaeffer's Dep. 13:18-22; *see also* ECF No. 31-17; Fischer Dep. 55:14-22, ECF No. 31-12 (testifying that Fischer and senior leadership agreed "that it's confusing to have children in the picture" when "you're wanting to specify and talk about an adult population").)  Nothing in Schaeffer's deposition testimony suggests, much less establishes, that he terminated the Abandoned Marketing Campaign because the teacher in the campaign was Black.  (*See generally* Schaeffer's Dep.)  Rather, Schaeffer testified that he did not move forward with the Abandoned Marketing Campaign because showing a *teacher* in the marketing campaign sent the wrong message.  (*See* Schaeffer's Dep. 13:18-22, 66:18-22 ("[T]he execution [of the Abandoned Marketing Campaign] with a teacher with children in the background . . . when we were targeting adults was - - I did not believe to be an appropriate campaign for [our product].").)

Next, Plaintiff cites his own deposition as evidence that Schaeffer wanted to move away from the Abandoned Marketing Campaign because the teacher was Black.  (Pl.'s Dep. 108:3-110:6.)  Yet Plaintiff did not have firsthand knowledge of why Schaeffer did not want to use the Abandoned Marketing Campaign.  (*See id.*)  Plaintiff merely recounted his conversation with Cline, who had expressed confusion about the decision to abandon the Abandoned Marketing Campaign.  (*Id.*)  But Cline, too, testified that he did not have firsthand knowledge of why Schaeffer chose not to pursue the Abandoned Marketing Campaign.  (Cline Dep. 42:7-44:17, ECF No. 31-14.)  Rather, Cline testified that his knowledge of the decision came from Fischer.  (*Id.*)  Fischer then testified that she, along with senior leadership, personally decided against the use of

16

the Abandoned Marketing Campaign, because she felt that "when you have a product that is indicated for both child and adult, and you're wanting to specify and talk about an adult population, that it's confusing to have children in the picture as well.  So it's not good marketing strategy." (Fischer Dep. 55:14-22.)

The sum of the testimony makes clear that neither Plaintiff nor Cline has any first-hand knowledge of why Schaeffer decided not to use the Abandoned Marketing Campaign.  In fact, the testimony of Fischer, the only person with first-hand knowledge of Schaeffer's decision, makes no mention of race-based decision-making whatsoever, on her part or on Schaeffer's.  (*See id.*)  As a result, the evidence Plaintiff relies on to show Schaeffer's alleged discriminatory motive for vetoing the Abandoned Marketing Campaign does not support such a proposition.  On that evidence or any other evidence in the record, no reasonable juror could conclude that Schaeffer's decision not to use the Abandoned Marketing Campaign is evidence of pretext, as no one with first-hand knowledge could substantiate Plaintiff's claim.  Indeed, to survive summary judgment, Plaintiff must present more than speculation.  *See Boykins v. SEPTA*, 722 F. App'x 148, 158 (3d Cir. 2018) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (quoting *Lexington Ins. Co. v. W. Pennsylvania Hosp.*, 423 F.3d 318, 333 (3d Cir. 2005))).

Plaintiff then argues that Fischer harbored racial bias where she excitedly exclaimed that Plaintiff was her "diverse candidate when [she] brought [him] onto [her] team."  (ECF No. 31-1 at 6; Pl.'s Dep. 105:21-107:10.)  This allegation, even viewed in a light most favorable to Plaintiff, does not support that Fischer terminated Plaintiff on account of his race.  There is no indication in the record that this statement carried any racial animus.  In fact, the record establishes that Fischer did not want to terminate Plaintiff where Laura Bokhof, a Takeda Human Resources Manager,

testified that Fischer was shocked, disappointed, and "heartbroken" by the investigation's finding that Plaintiff should be terminated for dishonesty.  (Defs.' Ex. 4, Bokhof Dep. 36:14-38:10, ECF No. 27-4 at 48-53.)

Finally, Plaintiff argues that he was punished for conduct that other white employees were not punished for, which establishes pretext.  (ECF No. 31-1 at 27-28.)  Specifically, Plaintiff alleges that "Schaef[f]er and the other white employees broke the same unwritten rule" of collecting their transfer bonuses before they relocated to Boston, but unlike Plaintiff, who is Black, those white employees were not terminated.  (*Id.*)  Evidence of a double standard can support a showing of pretext at summary judgment.  *See Jason v. Showboat Hotel & Casino*, 747 A.2d 802, 807 (N.J. Super. Ct. App. Div. 2000) ("Evidence of pretext sufficient to permit the employee to reach a jury may be indirect . . . such as a demonstration 'that similarly situated employees were not treated equally.'" (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 258 (1981))).

But Plaintiff does not provide evidence upon which a reasonable juror could conclude a double standard existed at Takeda.  Plaintiff cites evidence that purportedly shows that four white employees were paid transfer bonuses before relocating to Boston and were not terminated as a result.  (PUSMF ¶¶ 78-81.)  Even construed liberally, the evidence is irrelevant here, because there is no evidence that Takeda terminated Plaintiff because he collected his Transfer Bonus before physically relocating to Boston.  (*See* Pl.'s Ex. JJ, ECF No. 31-39; Pl.'s Ex. KK, ECF No. 31-40; Pl.'s Ex. LL, ECF No. 31-41; Fischer Dep. 94:7-23.)  The evidence establishes, rather, that Plaintiff was terminated for dishonesty.  (ECF No. 27-1 at 15-16; *see* ECF No. 31-38 (stating that Takeda "reasonably concluded that [Plaintiff was] not honest and forthcoming in [his] interactions" with Takeda and that lack of honesty violated the Takeda Policies).)  Therefore, the record supports only one conclusion: that Plaintiff was terminated for acquiring an "option-to-lease" contract

18

instead of a lease and then representing to Takeda that he had acquired a lease and planned to move to Boston, but never did so.  (ECF No. 31-38; DSUMF & PRDSUMF ¶¶ 42-43, 66.)  Any evidence that shows that another employee collected a transfer bonus before physically relocating does not speak to whether Plaintiff was treated differently than other white employees when he was terminated.  Plaintiff does not provide any evidence that other white employees collected a transfer bonus under such similar circumstances as Plaintiff and was not terminated by Takeda.  (*See* ECF Nos. 31-39, 31-40, 31-41; Fischer Dep. 94:7-23.)

For all of these reasons, Plaintiff has failed to meet his burden to show pretext at the final step of the *McDonnell-Douglas* framework.  There are thus no genuine disputes of material fact for a jury to decide, and Defendants' motion for summary judgment on Count I must be granted.

### 2.   COUNT II: AIDING AND ABETTING AGAINST FISCHER

Defendants' motion for summary judgment on Count II is also granted.  The NJLAD includes a prohibition that goes beyond employers and provides that "[i]t shall be . . . unlawful discrimination . . . [f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden [under the NJLAD]."  N.J. Stat. Ann. 10:5-12(e).

> [I]n order to hold an employee liable as an aider or abettor, a plaintiff must show that (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation.
>
> [*Doe v. Schwerzler*, Civ. No. 06-3529, 2008 WL 4066338, at *5 (D.N.J. Aug. 27, 2008) (internal quotation marks omitted) (quoting *Tarr v. Ciasulli*, 853 A.2d 921, 928 (N.J. 2004)).]

Plaintiff alleges that Fischer aided Takeda's performance of the wrongful act that injured Plaintiff — that is, the discriminatory discharge.  (ECF No. 31-1 at 30.)  But because the Court grants summary judgment in favor of Takeda on Plaintiff's discriminatory discharge claim, Plaintiff cannot establish that Fischer aided and abetted a wrongful act.  *See Murray v. Beverage Distrib. Ctr., Inc.*, 757 F. Supp. 2d 480, 489 n.18 (D.N.J. 2010) (granting summary judgment against a plaintiff's aiding and abetting claims where summary judgment was granted on all other NJLAD claims); *Mitchell v. New Jersey Lottery*, Civ. No. 04-896, 2006 WL 1344092, at *12 (D.N.J. May 15, 2006) ("[A]n individual employee [cannot] be found liable for discrimination under NJLAD unless the employer is first found liable." (quoting *Hanani v. New Jersey*, Civ. No. 03-3111, 2005 WL 1308231, at *16 (D.N.J. May 31, 2005), *aff'd sub nom.*, *Hanani v. New Jersey Dep't of Env't Prot.*, 205 F. App'x 71 (3d Cir. 2006))).  Accordingly, Defendants' motion for summary judgment on Count II is also granted.

## B.   DEFENDANTS' CONTRACT COUNTERCLAIMS

As for Defendants' counterclaims against Plaintiff, summary judgment in Defendants' favor is appropriate as to Counterclaim I but not as to the remainder of Defendants' counterclaims.

### 1.   COUNTERCLAIMS I & II: BREACH OF CONTRACT (SIGNING BONUS & TRANSFER BONUS)

As an initial matter, the First and Second Offer Letters both constitute express contracts. A "contract is express if the agreement is manifested by written or spoken words." *Fittipaldi v. Monmouth Univ.*, Civ. No. 20-5526, 2021 WL 2210740, at *4 (D.N.J. 2021) (quoting *Wanaque Borough Sewerage Auth. v. Twp. of West Milford*, 677 A.2d 747, 752 (N.J. 1996)); *see also Baer v. Chase*, 392 F.3d 609, 616 (3d Cir. 2004) ("Contracts are 'express' when the parties state their terms.").  The First and Second Offer Letters, manifested in written words, contain the terms of acceptance for Plaintiff's roles with Takeda, compensation provisions for his new positions, and

terms for how Plaintiff could collect the Signing and Transfer Bonuses.  (ECF No. 27-5 at 9-12; ECF No. 27-4 at 63-66.)  *See Sams v. Pinnacle Treatment Ctrs., Inc.*, Civ. No. 18-9610, 2021 WL 567986, at *4-5 (D.N.J. Feb. 16, 2021) (finding that "[o]ffer letters may be found to create a contract or contractual obligations, including the obligation to pay . . . bonuses" and that "compensation . . . is an essential term of any contract" (internal quotation marks and citation omitted)); *Hanisko v. Billy Casper Golf Mgmt., Inc.*, 98 A.3d 1192, 1199-1200 (N.J. Super. Ct. App. Div. 2014) (finding a signed offer letter constitutes an express contract where it contains material terms such as compensation).  For these reasons, and because neither party contests that the First or Second Offer Letters are express and binding, the Court will conduct a traditional breach of express contract analysis for both Counterclaim I and II.

a.       Counterclaim I: Breach of Contract (Signing Bonus)

Takeda argues that it is entitled to recover the Signing Bonus under the provisions set forth in the First Offer Letter.  (ECF No. 27-1 at 29.)  The First Offer Letter provides:

> [I]f [Plaintiff's] employment ends for any reason other than in connection with a reduction in force and/or a [Takeda] restructuring prior to the two-year anniversary of [Plaintiff's] start date with Takeda, [Plaintiff] agree[s] to repay Takeda 100% of the gross amount of the Signing Bonus, within 30 days of [Plaintiff's] separation date.

[(ECF No. 27-1 at 29-30; ECF No. 27-5 at 9-12.)]

The one-time signing bonus offered to Plaintiff if he accepted his first role with Takeda was $65,000.  (ECF No. 27-5 at 9-12.)  As Plaintiff commenced employment on July 9, 2018, and was terminated on March 9, 2020, for reasons unrelated to a workforce reduction or company restructuring, Defendants argue that Plaintiff must return his Signing Bonus.  (ECF No. 27-1 at 29-30.)  Plaintiff does not contest that the First Offer Letter is a binding contract; rather, Plaintiff

argues that equitable estoppel and the doctrine of unclean hands bar Defendants from recovering in this case.  (ECF No. 31-1 at 32-33.)

Both of Plaintiff's arguments fail.  First, it is unclear how equitable estoppel applies to the facts of this case.  Generally, "[e]quitable estoppel applies in circumstances where 'one may, by voluntary conduct, be precluded from taking a course of action that would work injustice and wrong to one who with good reason and in good faith has relied upon such conduct.'"  *Sellers v. Bd. of Trs. of Police and Firemen's Ret. Sys.*, 942 A.2d 870, 874 (N.J. Super. Ct. App. Div. 2008). Other than providing this general rule, Plaintiff offers no further discussion substantiating his equitable estoppel argument.  (ECF No. 31-1 at 32.)  To the extent Plaintiff argues that "Takeda is responsible for the fact that Plaintiff did not work," Takeda was entitled to terminate Plaintiff for violation of its policies and still seek to recover the Signing Bonus under the express provisions of the First Offer Letter.  (*See* ECF No. 27-5 at 9-12 ("[I]f [Plaintiff's] employment ends for *any reason* other than in connection with a reduction in force and/or a [Takeda] restructuring prior to the two-year anniversary of [Plaintiff's] start date with Takeda, [Plaintiff] agree[s] to repay Takeda 100% of the gross amount of the Signing Bonus" (emphasis added).)  Moreover, the Court has already found that Takeda did not engage in discriminatory conduct when terminating Plaintiff, and as such, the Court can find no reason why the equitable remedy of equitable estoppel would be applicable here.

Plaintiff's unclean hands defense fares no better.  To successfully invoke the unclean hands doctrine, a party must show that "(1) the party seeking equitable relief committed an unconscionable act; and (2) the act is related to the claim upon which equitable relief is sought." *Scherer Design Grp., LLC v. Ahead Eng'g LLC*, 764 F. App'x 147, 150 (3d Cir. 2019).  Here, because Plaintiff failed to successfully claim that Defendants engaged in any wrongdoing when

terminating Plaintiff, Plaintiff failed to establish that Defendants had "unclean hands" or committed an "unconscionable act" capable of justifying the invocation of the doctrine. Plaintiff appears to acknowledge that the unclean hands defense must fail here, as he asserts that Defendants' first counterclaim "could only be decided in Defendants' favor if [Defendants] first defeat Plaintiff's claims." (ECF No. 31-1 at 33.) For these reasons, Defendants' motion for summary judgment on Counterclaim I is granted.

b.   Breach of Contract (Transfer Bonus)

Defendants' motion for summary judgment on their second breach-of-contract claim is denied. "[W]here the terms of [an express] contract are clear and unambiguous, there is no room for interpretation or construction and the courts must enforce those terms as written." *Black Ship, LLC v. Heartland Payment Sys., LLC*, Civ. No. 21-13855, 2023 WL 3585329, at *6 (D.N.J. May 22, 2023) (quoting *Namerow v. PediatriCare Assocs., LLC*, 218 A.3d 839, 843 (N.J. Super. Ct. Ch. Div. 2018)). "An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations." *Cooper River Plaza E., LLC v. Briad Grp.*, 820 A.2d 690, 697 (N.J. Super. Ct. App. Div. 2003) (citation omitted). "[I]n a contract interpretation action, summary judgment is appropriate only where a contract is unambiguous." *Simoni v. Diamond*, Civ. No. 10-6798, 2014 WL 4724677, at *4 (D.N.J. Sept. 23, 2014) (quoting *Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 418 (3d Cir. 2013)).

Defendants allege two alternate theories of breach under the Second Offer Letter: (1) that Plaintiff breached the contract by obtaining an "option-to-lease" contract from a Boston landlord instead of a "lease," and (2) that Plaintiff breached the Second Offer Letter by failing to repay the Transfer Bonus after he was terminated for cause within one year of collecting the Transfer Bonus. (ECF No. 27-1 at 30-31.)

23

As to Defendants' first theory, summary judgment is not appropriate, because there remains a genuine dispute of material fact as to whether the acquisition of an "option-to-lease" contract, as opposed to a typical lease, constitutes a breach of the Second Offer Letter.  Although Defendants argue that the "option-to-lease" contract that Plaintiff provided them was a "sham lease," the Second Offer Letter did not define "lease" other than to state that Plaintiff needed to provide a signed contract for "lease of a home."  (*Id.* at 30-31; ECF No. 27-4 at 63-66.)  Plaintiff interprets the Second Offer Letter as allowing for an "option-to-lease" contract to collect the Transfer Bonus, and he argues that he provided a signed "lease" by this definition.  (*See* ECF No. 31-1 at 33-34.)  As the term "lease" is not clearly defined in the Second Offer Letter and there are two reasonable interpretations of the term, an ambiguity exists.

Summary judgment is also not appropriate on Defendants' second theory of breach.  The Second Offer Letter stipulates that "[i]n the event that you resign your employment or are terminated for [c]ause less than one (1) year after the date you receive your Transfer Bonus, you will be required to repay Takeda."  (ECF No. 27-4 at 65.)  One "cause" for termination that mandates repayment of the Transfer Bonus within one year under the terms set forth in the Second Offer Letter is violation of the Takeda Policies.  (*See id.* (listing causes for termination that require repayment of the Transfer Bonus as, in pertinent part, "serious misconduct" or "violation of company policy").)  As established in the undisputed record and discussed above, one such policy that justifies termination is dishonesty.  (DSUMF & PRDSUMF ¶¶ 77-78.)  Dishonesty is the stated reason that Takeda terminated Plaintiff.  (ECF No. 27-1 at 15-16; *see* ECF No. 31-38 (stating that Takeda "reasonably concluded that [Plaintiff was] not honest and forthcoming in [his] interactions" with Takeda and that his lack of honesty violated the Takeda Policies).)

As Plaintiff was terminated for cause within one year of collecting his Transfer Bonus, the Second Offer Letter, by its express terms, requires Plaintiff to repay the Transfer Bonus.[10]  (ECF No. 27-4 at 65.)  Plaintiff, however, argues that the record does not support a finding that he was dishonest, and therefore, he should not have been terminated for cause.  (ECF No. 31-1 at 35.)  Plaintiff further maintains that he never hid the fact that he lived in New Jersey, and therefore, Defendants are equitably estopped from enforcing the timing provision of the Transfer Bonus because they wrongfully terminated Plaintiff by construing him as dishonest.  (ECF No. 31-1 at 35-36.)  Although Plaintiff again fails to elaborate on his equitable estoppel argument, and the Court again is not convinced it is applicable, Defendants only reply to Plaintiff's opposition by arguing that "improperly claiming a $50,000 bonus is [c]ause under any definition."  (ECF No. 33 at 17 n.4.)  As Defendants' reply leaves the dispute unresolved, the Court must conclude that summary judgment is not yet appropriate where factual disputes remain as to whether Plaintiff "improperly" claimed the Transfer Bonus. (*See* ECF No. 31-38 (identifying dishonesty and a lack of forthcomingness as the basis for terminating Plaintiff, both findings which Plaintiff presents evidence to rebut).)  Defendants cite no law clarifying why Plaintiff's equitable estoppel argument fails, nor do Defendants provide any case law establishing that Plaintiff cannot challenge the validity of his termination for cause in the context of a breach-of-contract claim.  (*See generally* ECF Nos. 27-1, 33.)

Defendants have not carried their burden on summary judgment as to Counterclaim II, and therefore, Defendants' motion for summary judgment on Counterclaim II is denied.

---

[10]     Plaintiff was terminated on March 9, 2020.  (DSUMF & PRDSUMF ¶ 75.)  On October 6, 2019, or sometime thereafter, Plaintiff's Transfer Bonus was submitted for processing.  (DSUMF & PRDSUMF ¶¶ 32-33.)  Therefore, a year did not pass between Plaintiff's receipt of the Transfer Bonus and his termination.

2.  U̲N̲D̲E̲R̲L̲I̲N̲E̲D̲ ̲H̲E̲A̲D̲I̲N̲G̲: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Genuine disputes of material fact remain as to whether Plaintiff breached the implied covenant of good faith and fair dealing claim.  The implied covenant of good faith and fair dealing is contained in every contract in New Jersey.  *Kalogeras v. 239 Broad Ave., L.L.C.*, 997 A.2d 943, 953 (N.J. 2010) (internal quotation marks and citations omitted).  The implied covenant establishes that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Wood v. N.J. Mfrs. Ins. Co.*, 21 A.3d 1131, 1140 (N.J. 2011).  "[A]n allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent an improper motive."  *Wade v. Kessler Inst.*, 798 A.2d 1251, 1260 (N.J. 2002).  Further, the implied covenant of good faith and fair dealing applies to a contract's performance and its enforcement.  *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1126 (N.J. 2001).  Thus, to show a breach of the implied covenant of good faith and fair dealing, a moving party must prove the following:

> (1) a contract exists between the [parties]; (2) the [moving party] performed under the terms of the contract [unless excused]; (3) the [non-moving party] engaged in conduct, apart from its contractual obligations, without good faith and for the purpose of depriving the [moving party] of the rights and benefits under the contract; and (4) the [non-moving party's] conduct caused the plaintiff to suffer injury, damage, loss, or harm.
>
> [*M&T Bank v. Worldwide Supply LLC*, Civ. No. 20-6378, 2021 WL 9667960, at *3 (D.N.J. Feb. 17, 2021) (internal quotation marks and citation omitted).]

Here, genuine disputes remain as to whether Plaintiff acted in bad faith when he collected the Transfer Bonus.  Defendants argue that Takeda reasonably expected under the Second Offer Letter that Plaintiff would move from New Jersey to Boston.  (ECF No. 27-1 at 32.)  Defendants then argue that Plaintiff engaged in bad faith where he signed a "sham lease," which was really an

"option-to-lease" contract that he entered for the sole purpose of improperly collecting the Transfer Bonus. (*See id.* 32-33.) Plaintiff counters that he never engaged in any bad faith and was terminated before he had an opportunity to move. (*See* ECF No. 31-1 at 37.) In support, Plaintiff provides evidence that he was told that he did not need to move to his Boston apartment before September 2020. (*See* Cline Dep. 3:1-14.) By providing evidence to support his belief that he did not need to move to Boston until September 2020, Plaintiff reasonably suggests that he did not act in bad faith when entering his "option-to-lease" contract because he could still have exercised his option to lease the apartment before the September 2020 deadline. (*See* Pl.'s Dep. 42:18-19, 73:17-74:15, 78:4-18.)

Ultimately, it is for a jury to decide whether Plaintiff engaged in any bad faith where he interpreted the Second Offer Letter's requirement that he obtain a lease as allowing him to obtain an "option-to-lease" contract to collect his Transfer Bonus. Thus, Defendants' motion for summary judgment on their breach of the implied covenant of good faith and fair dealing claim is denied.

### 3.    UNJUST ENRICHMENT

Defendants' motion for summary judgment on their unjust enrichment claim must be denied. "To establish a claim for unjust enrichment, a [moving party] must prove that '(1) at [the moving party's] expense; (2) [the non-moving party] received a benefit; (3) under circumstances that would make it unjust for [the non-moving party] to retain said benefit without paying for it.'" *Soranno v. Heartland Payment Sys., LLC*, Civ. No. 18-16218, 2020 WL 5652469, at *10 (D.N.J. Sept. 23, 2020) (quoting *Maniscalco v. Bro. Intern. Corp. (USA)*, 627 F. Supp. 2d 494, 505 (D.N.J. 2009)). In New Jersey, "[r]estitution for unjust enrichment is an equitable remedy, available only when there is no adequate remedy at law." *Bell v. United Auto Grp., Inc.*, Civ. No. 05-2262, 2006

WL 231572, at *3 (D.N.J. Jan. 30, 2006) (citing *Nat'l Amusements, Inc. v. N.J. Tpk. Auth.*, 619 A.2d 262, 267 (N.J. Super. Ct. Law Div. 1992)).  "Therefore, recovery based on a quasi-contract theory," such as unjust enrichment, "is mutually exclusive of a recovery based on a contract theory," like a breach-of-contract claim.  *Id.* (citing *Caputo v. Nice-Pak Prods., Inc.*, 693 A.2d 494, 498 (N.J. 1997)).  Accordingly, a plaintiff cannot collect on both a breach-of-contract claim and unjust enrichment claim.  *Caputo*, 693 A.2d at 498; *see also Soranno*, 2020 WL 5652469, at *10 ("[B]ecause unjust enrichment is an equitable remedy resorted to only when there was no express contract providing for renumeration, a plaintiff may recover on one or the other theory, but not both." (internal quotation marks and citation omitted)); *All Seasons Home Improvement Co. v. Arch Concept Constr., Inc.*, Civ. No. 16-751, 2018 WL 3928787, at *8 (D.N.J. Aug. 16, 2018) ("[W]here there is an express contract covering the identical subject matter of the claim, [a] plaintiff cannot pursue a quasi-contractual claim for unjust enrichment." (citations omitted)).

Here, both the First and Second Offer Letters are express contracts.  Critically, "[t]here can be no claim for unjust enrichment when express contract[s] exist[] between parties."  *In re Philips/Magnavox Television Litig.*, Civ. No. 09-3072, 2010 WL 3522787, at *10 (D.N.J. Sept. 1, 2010) (quoting 17 C.J.S. Contracts § 7 (2010)).  This is because "[i]t is a well settled rule than an express contract excludes an implied one."  *Id.* (quoting *Moser v. Milner Hotels, Inc.*, 78 A.2d 393, 394 (1951)).  An unjust enrichment claim can move forward as an alternative to a breach-of-contract claim only where the enforceability of a contract is at issue.  *Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 259 (D.N.J. 2020) (citation omitted).  Here, the parties do not contest the enforceability of the First or Second Offer Letter; they contest whether the contracts were in fact breached.  (*See generally* ECF Nos. 27-1, 31-1, 33.)  As a result, Defendants' motion for summary judgment on their unjust enrichment claim is denied.

IV.   **<u>CONCLUSION</u>**

For the reasons outlined above, Defendants' motion for summary judgment (ECF No. 27) is **GRANTED IN PART** and **DENIED IN PART**.  Specifically, Defendants' motion for summary judgment against both of Plaintiff's Counts is **GRANTED**, Defendants' motion for summary judgment in favor of Counterclaim I is **GRANTED**, and Defendants' motion for summary judgment in favor of their remaining Counterclaims is **DENIED**.  An appropriate Order follows.

Dated: August 31, 2023

*s/ Georgette Castner*
**GEORGETTE CASTNER**
**UNITED STATES DISTRICT JUDGE**